1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RANDY ALLEN REVAK,

11          Petitioner,              No. CIV S-00-1685 LKK JFM P

12      vs.

13   R. Q. HICKMAN, et al.,

14          Respondents.             FINDINGS & RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1996 conviction on

18   charges of kidnapping with the intent to commit rape (Cal. Pen. Code § 208(d)), forcible rape

19   (Cal. Pen. Code § 261(a)(2)), forcible oral copulation (Cal. Pen. Code § 288a(c)), and rape with a

20   foreign object (Cal. Pen. Code § 289(a)), with three prior "strike" convictions.  He seeks relief on

21   the grounds that:  (1) the trial court committed sentencing error; (2) his right to due process and

22   notice of the charges against him was violated by the imposition of a sentencing enhancement;

23   (3) the trial court violated his right to present a defense when it excluded evidence bearing on the

24   credibility of the victim; (4) the trial court erred when it refused to grant petitioner access to

25   confidential information from two state agencies regarding the victim's children; and (5) the trial

26   court improperly granted petitioner's motion to represent himself.  Upon careful consideration of

                                        1

1    the record and the applicable law, the undersigned will recommend that petitioner's application

2    for habeas corpus relief be denied.

3                              FACTUAL BACKGROUND[1]

4           Audra W. testified that around 1:00 a.m. on August 13, 1995, she
            got into an argument with her friend Scott as he was giving her a

5           ride to Country Club Lanes, a bowling alley on Watt Avenue
            between El Camino and Marconi.  Consequently, she got out of his

6           pickup truck and began walking.

7           Audra saw defendant.  Although she did not know him, Audra
            recognized him as a person named "Randy" whom she had seen at

8           the bowling alley.  Defendant asked where she was going.  She said
            the bowling alley and then accepted his invitation to accompany

9           her there.

10          Defendant flagged down a passing car, and the driver agreed to
            give them a ride to the bowling alley.  There was a passenger in the

11          front seat and the car was "full of stuff," so Audra had to sit on
            defendant's lap to fit into the space available in the back seat.

12          When they reached the Pacific Bell building located near the
            bowling alley, defendant asked the driver to let them out because

13          defendant's legs were hurting.  The driver obliged and drove off.

14          Audra and defendant then walked down an alley toward the
            bowling alley.  As they approached a loading dock of the Pacific

15          Bell building, defendant told her he had left a "joint" there the day
            before.  He asked her to help him find it.  Audra told him she

16          "didn't smoke pot," and began to walk away.  Defendant then
            suggested she accompany him to his house because he had "dope"

17          there.  Feeling uneasy and that she "just needed to get away from
            him," Audra declined, saying she had to meet a friend at the

18          bowling alley.  As Audra continued walking toward the bowling
            alley, defendant grabbed her and told her to "give him a kiss, show

19          him some respect for him getting [her] a ride."  When she refused,
            he dragged her back to the loading dock.  She struggled and

20          defendant slapped and punched her repeatedly.  Defendant threw
            her to the ground behind a dumpster and tore off her clothes.

21          When she screamed, defendant threatened to stab her.  He then
            committed the sexual assaults for which he was convicted.

22
            Following the assaults, Audra grabbed her clothing, hid in some

23          bushes and put her clothes on as best she could, and then ran to the

24

25          _____
                 [1]  This statement of facts is taken from the July 9, 1999, opinion by the California Court

26      of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-5, appended as Exhibit
        A to Respondent's Answer, filed on February 9, 2001.

                                            2

bowling alley.  There she told a bartender, whom she knew, that she had been raped and asked him to call the police.

Sergeant Ivan Clark, an off-duty deputy sheriff who was providing security, saw Audra enter the bowling alley.  When he spoke with her, she was shaking and crying, and her clothing was torn.  Audra told him she had been assaulted by "Randy."  Clark drove her around the area in an unsuccessful attempt to locate defendant.  While they were in the car, Clark checked Audra for signs of alcohol or narcotics use.  He noticed neither, and Audra denied drinking or taking any drugs that day.

Clark took Audra to U.S. Davis Medical Center, where she was given a sexual assault examination, which revealed mucosal tears in her vaginal tissues as well as redness and tenderness, injuries consistent with forcible intercourse or "possible" "rough sex."  A sample of Audra's blood revealed no evidence of alcohol or methamphetamine.  Audra told the examining nurse practitioner that defendant made repeated threats to "stab her in the neck."

Gail Clark, with whom defendant had been staying as a boarder, testified that defendant returned to Clark's residence in the early morning hours of August 13, acting nervous and scared.  He said he had "stabbed a Nigger in the neck" behind a dumpster at the ARCO gasoline station at Watt and Marconi.  Clark ordered defendant to leave the house.  Fearing that someone might have been injured, Clark called the gas station and asked the proprietor to check the dumpster.

Defendant testified, admitting prior convictions for burglary in 1985, robbery in 1981, and assault with a deadly weapon in 1989.  According to defendant, while he and Audra were walking to Country Club Lanes, they stopped near a dumpster for her to rest.  She began "coming on" to him, licking his ear and fondling his crotch.  She told him she "wanted him right there," and they engaged in sexual intercourse.  He neither forced nor struck her, nor did they engage in any other sexual acts.  She did not want him to walk her into the bowling alley because she was meeting another man.  Defendant testified that Audra smelled of a "little bit of booze' but was not drunk, just "tipsy."  She also "acted strange" or "loaded."  Claiming that Audra was a "biker girl," defendant asserted that her motive for falsely accusing him of the sexual assaults was to get even with him on behalf of the Misfits, a motorcycle gang that he had refused to join.

/////

/////

/////

ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 573 U.S. 3, 8 (2002) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court

1   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

2   habeas court independently reviews the record to determine whether habeas corpus relief is

3   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

4   II.  Petitioner's Claims

5        A.  Sentencing Error

6            Petitioner makes two claims of sentencing error.  In claim one, he argues that the

7   trial court violated Cal. Pen. Code § 667.61 when it tripled his sentence for oral copulation.

8   (Points and Authorities attached to petition (Pet.) at 9.)  In claim four, he argues that the trial

9   court erred in imposing consecutive sentences.  (Id. at 23.)[2]  The California Court of Appeal

10  rejected these claims on state law grounds.  (Opinion at 11-16.)

11           Petitioner's claims of sentencing error are not cognizable in this federal habeas

12  corpus proceeding.  Habeas corpus relief is unavailable for alleged errors in the interpretation or

13  application of state sentencing laws by either a state trial court or a state appellate court.

14  Hendricks v. Zenon, 993 F.2d 664, 674 (9th Cir. 1993).  So long as a state sentence "is not based

15  on any proscribed federal grounds such as being cruel and unusual, racially or ethnically

16  motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of

17  state concern."  Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976).  The Ninth

18  Circuit has specifically refused to consider state law errors in the application of state sentencing

19  law.  See, e.g., Miller v. Vasquez, 868 F.2d 1116 (9th Cir. 1989).  In Miller, the court refused to

20  examine the state court's determination that a defendant's prior conviction was for a "serious

21  felony" within the meaning of the state statutes governing sentence enhancements.  Id. at 1118-

22  19.  The court did not reach the merits of the Miller petitioner's claim, stating that federal habeas

23  /////

24  ────────────────────

25       [2]  Petitioner was sentenced to state prison for 75 years to life on count II (forcible oral
     copulation); a consecutive term of 25 years to life on each of the remaining counts, with the
     exception of the term for count I, which was stayed pursuant to section 654; and a consecutive
26  term of 5 years on each of two prior serious felony conviction enhancements.  (Opinion at 1-2.)

1   relief is not available for alleged errors in interpreting and applying state law.  Id.  (quoting

2   Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985)).

3           In Estelle v. McGuire, 502 U.S. 62 (1991), the Supreme Court reiterated the

4   standard of review for a federal habeas court.  It held that "it is not the province of a federal

5   habeas court to reexamine state court determinations on state law questions."  Id. at 65.  The

6   court emphasized that "federal habeas corpus relief does not lie for error in state law."  Id. (citing

7   Lewis v. Jeffers, 497 U.S. 764 (1990) and Pulley v. Harris, 465 U.S. 37, 41 (1984)).  The court

8   further noted that the standard of review for a federal habeas court "is limited to deciding

9   whether a conviction violated the Constitution, laws, or treaties of the United States (citations

10  omitted)."  Estelle, 502 U.S. at 67.

11          Petitioner's claims of sentencing error do not state a federal claim.  In addition,

12  after a careful review of the record of the sentencing proceedings, this court finds no federal

13  constitutional error in connection with petitioner's sentence.  Accordingly, these claims should

14  be denied.

15      B.  Right to Notice

16          Relying on Jones v. United States, 526 U.S. 227 (1999) and Apprendi v. New

17  Jersey, 530 U.S. 466 (2000), petitioner claims that his Fifth Amendment right to due process and

18  his Sixth Amendment right to notice of the charges against him were violated when his sentence

19  was enhanced pursuant to a California statute that was not charged in the information.

20          The California Court of Appeal described petitioner's claim and its resolution as follows:

21              Section 667.61, subdivision (i) states: "For the penalties provided
                in this section to apply, the existence of any fact required under
22              subdivision (d) or (e) shall be alleged in the accusatory pleading
                and either admitted by the defendant in open court or found to be
23              true by the trier of fact."[3]

24              In a supplemental brief, defendant notes that section 667.61 was
                not alleged in the accusatory pleading (the complaint deemed an
25

26          [3]  Hereafter all references to subdivisions are to those of section 667.61.

6

information) and was not mentioned during the jury trial or the court trial on the prior conviction.  Hence, he contends, he was deprived of notice guaranteed by the due process clause and was denied a trial on the allegations under section 667.61, and thus could not be sentenced pursuant to that section.

While it is true the accusatory pleading did not specifically refer to section 667.61, no such reference is required.  All that section 667.61, subdivision (g) mandates is the accusatory pleading set forth all of the *facts* necessary to bring the defendant within the scope of that section.

The offenses which brought defendant within section 667.61, subdivision (a) are forcible rape (subd. (c)(1)), penetration of a genital opening with a foreign object (subd. (c)(5)), forcible oral copulation (subd. (c)(6)), under circumstances where the victim was kidnapped and her movement substantially increased the risk of harm over and above that level of risk necessarily inherent in the underlying offenses (subd. (d)(2)).

Each of those requisite offenses was charged in the accusatory pleading.  The jury was fully instructed on the offenses, and found defendant guilty of each offense.

The kidnapping with the intent to commit rape was charged as a violation of "section 208(d)."  The jurors were instructed that, in order to convict defendant of the kidnapping charged in count I, they had to find that defendant's movement of the victim "substantially increase[d] the risk of harm to such person over and above that necessarily present in the crime itself."  The jury made that finding and convicted defendant of the kidnapping.

Thus, the accusatory pleading alleged all of the facts necessary to bring defendant within the scope of section 667.61, and the jury determined all of the necessary allegations.

Consequently, defendant's claim of error fails.

(Opinion at 19-21.)[4]

_____

[4]  Cal. Pen. Code § 667.61 provides, in relevant part, as follows:

(a) A person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years except as provided in subdivision (j).

(c) This section shall apply to any of the following offenses:

1    Petitioner's central claim before this court is that his Fifth Amendment right to

2    due process and Sixth Amendment right to notice of the charges against him were violated

3    because he was not aware that he had to defend against Cal. Pen. Code § 667.61.  The California

4    Court of Appeal found that all of the facts used to increase petitioner's punishment were pled in

5    the information, submitted to petitioner's jury, and found to be true beyond a reasonable doubt.

6    For this reason, according to the state court, petitioner had notice of all of the factors that were

7    later used to increase his punishment.  The state court's decision in this regard is not contrary to

8    federal law, nor is it based on an unreasonable determination of the facts in this case.

9    In <u>Jones</u>, the defendant committed a carjacking which resulted in one victim

10   suffering serious bodily injury.  The defendant was charged under a federal statute that provided

11   for a higher penalty range if the offense involved serious bodily harm or death.  The indictment

12   and jury instructions did not include facts or subsections regarding the "serious bodily harm"

13   _____

14
15       (1) A violation of paragraph (2) of subdivision (a) of Section 261.

16       (4) A violation of subdivision (b) of Section 288.
17
         (5) A violation of subdivision (a) of Section 289.
18
         (6) Sodomy or oral copulation in violation of Section 286 or 288a
19       by force, violence, duress, menace, or fear of immediate and
20       unlawful bodily injury on the victim or another person.

21       (d) The following circumstances shall apply to the offenses
22       specified in subdivision (c):

23       (2) The defendant kidnapped the victim of the present offense and
24       the movement of the victim substantially increased the risk of harm
25       to the victim over and above that level of risk necessarily inherent
         in the underlying offense in subdivision (c).

         (i) For the penalties provided in this section to apply, the existence
24       of any fact required under subdivision (d) or (e) shall be alleged in
25       the accusatory pleading and either admitted by the defendant in
         open court or found to be true by the trier of fact.

26

element of the offense, and this element was not found by the jury beyond a reasonable doubt.
As a result, the defendant's conviction and sentence, which was based on this element, were
reversed.  Here, on the contrary, and as described by the state appellate court, the facts that
triggered the application of Cal. Pen. Code § 667.61 were charged in the information, submitted
to petitioner's jury, and proved beyond a reasonable doubt.  Accordingly, <u>Jones</u> does not provide
support for petitioner's argument.

In <u>Apprendi</u>, the United States Supreme Court held that "[o]ther than the fact of a
prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable doubt."  <u>Id.</u> 530 U.S. at
490.  As described above, that is exactly what happened here: the facts that triggered the
application of Cal. Pen. Code § 667.61 were submitted to petitioner's jury and proved beyond a
reasonable doubt.  In any event, <u>Apprendi</u> does not apply retroactively to cases on collateral
review.  <u>Schriro v. Summerlin</u>, ___ U.S. ___, 124 S.Ct. 2519 (2004); <u>Blakely v. Washington</u>, ___
U.S. ___, 124 S.Ct. 2531, 2549 (2004) (O'Connor, J., dissenting).  Therefore, it cannot provide
support for petitioner's argument.

Petitioner's claim, if any, that California law requires the inclusion of Cal. Pen.
Code § 667.61 in the information in order to impose the sentencing enhancement contained
therein does not state a federal claim.  The opinion of the California Court of Appeal that
California law does not require the recitation of that code section in the charging document is
binding on this court.  <u>See</u> <u>Aponte v. Gomez</u>, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts
are "bound by a state court's construction of its own penal statutes"); <u>Estelle</u>, 502 U.S. at 67-68
(federal habeas corpus relief is unavailable to overturn a state court decision on a claim involving
only state law).  It is true that under federal law, an indictment must set forth all of the elements
of the offense.  <u>Russell v. United States</u>, 369 U.S. 749, 763-64 (1962).  In addition, "under the
Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth
Amendment, any fact (other than a prior conviction) that increases the maximum penalty for a

1   crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable

2   doubt." <u>Jones</u>, 526 U.S. at 243 n.6.  However, even assuming arguendo that Cal. Pen. Code §

3   667.61 is an element of the offenses charged against petitioner or a "fact" that increases the

4   maximum penalty for a crime, the Fourteenth Amendment has never been construed to

5   incorporate against the states  "the Fifth Amendment right to 'presentment or indictment by a

6   Grand Jury.'" <u>Apprendi</u>, 530 U.S. at 477 n. 3 (citation omitted).  Therefore, any claim that

7   petitioner's sentence is invalid because Cal. Pen. Code § 667.61 was not pled in the information

8   is not contrary to or an unreasonable application of federal law.

9         Petitioner has failed to carry his burden under 28 U.S.C. § 2254(d) with respect to

10   this claim.  Accordingly, the claim should be denied.

11         C.  <u>Exclusion of Evidence</u>

12         Citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973) and <u>Rock v. Arkansas</u>,

13   483 U.S. 44, 45 (1987), petitioner claims that the trial court violated his right to present

14   witnesses in his own defense when it excluded evidence that the victim possessed and sold

15   methamphetamine.

16         The California Court of Appeal described the background to this claim and its

17   resolution as follows:

18         Prior to trial, and for the purpose of challenging Audra's
          credibility, defendant filed a motion to introduce testimony by

19         James Bohanon, Bobbi Ackerman, William Ellis, and Roger Wise,
          purporting to establish that Audra had sold methamphetamine and

20         possessed it for sale.  The court reviewed the written offers of
          proof and deferred ruling on the motion until the court heard

21         testimony from toxicologist, James Beede, who examined Audra's
          blood sample drawn the night of the assault.  Following Beede's

22         testimony, defendant renewed his motion, which the court denied.

23         Defendant contends the ruling was erroneous and precluded him
          from effectively challenging Audra's credibility.

24                                        * * *

25
          Defendant claims the proffered testimony of Bohanon, Ackerman,
26         Ellis and Wise was relevant to Audra's credibility because it would

                                        10

prove that she "possessed for sale and sold methamphetamine or '"crank.'"

With one exception, the offers of proof tended to no more than generally degrade Audra's physical appearance and show that she was a "biker girl," dressed like a "hooker," was a prostitute, used methamphetamine, and exchanged sex for that drug.

Ellis, the security officer at the apartment where Audra lived in August 1995, is reported to have stated that either he or Ackerman, the apartment manager, had to call the police because of activities at Audra's apartment: "people, mainly men, [were] going in and out of her place – too much foot traffic. Then 'all the men would leave' before the police arrived. [Ellis] said he observed [Audra] hit and knock to the ground a 6 ft. 6 inch, 270 lb. man when he improperly grabbed her one night. (She could take care of herself.) [Audra] told him she used to hang out with bikers and was a 'biker girl.' He observed her when she went out at night. She would wear a black leather mini skirt or very tight pants and black knit stockings, and boots with 4" heels. He used to joke with the manager that [Audra] 'dressed like a hooker.'"

As nothing in this offer of proof would support a finding that Audra sold methamphetamine or possessed it for sale, the trial court properly denied the motion to introduce Ellis's testimony.

Ackerman is reported to have said: [Audra] was evicted in May 1995 for nonpayment of rent, and for excessive foot traffic in and out of her place. [Ackerman] observed as many as 7 or 8 men go in and out of [Audra's] apartment on any given night. Most of the men 'looked like street people.'" Ackerman believed the men and Audra were using drugs as Ackerman had "problems with tenants using drugs in her apartments before, and recognized the behavior."

As nothing in this offer of proof would support a finding that Audra sold methamphetamine or possessed it for sale, the trial court properly denied the motion to introduce Ackerman's testimony.

Wise, a tenant in the complex where Audra lived, is reported to have said that he, too, saw heavy foot traffic in and out of Audra's apartment. He speculated that the short visits were drug buys and heard rumors that Audra and another tenant were selling drugs. Audra once told him she used drugs, in her words: "'That's my life, and no one can take it away from me.'" She told him she hid drugs in her apartment.

As neither Audra's statements to him, Wise's speculation, nor the rumors he had heard would support a finding that Audra sold

methamphetamine or possessed it for sale, the trial court properly denied the motion to introduce Wise's testimony.

Bohanon, who "'crashed' (lived)" at Audra's apartment "on and off, for a period of 1 to 3 weeks, in November to December 1994," is reported to have said he "observed at least 3 different men living with her, spending the night on different nights. He did not see any exchange of drugs for sex with these men. He did observe her packaging drugs (meth) for sale. He observed her take men into her bedroom for the purposes of sale of drugs. The men had money and would come out with drugs. He observed [Audra] as being thin, unattractive, and a 'crank' user. . . ."

Although this offer of proof is mainly conclusory, it is sufficient to show Bohanon could provide some evidence that Audra had been a seller of methamphetamine. Hence, the trial court should not have excluded the proffered testimony unless the court exercised its discretion to do so pursuant to Evidence Code section 352.

The record reflects the court did not exclude the proffered testimony based on Evidence Code section 352. Rather, the court concluded the toxicology report of Audra's blood taken after the incident "close[d] the door" on the proffered testimony because the report showed she had not consumed any alcohol or drugs. Thus, evidence of her past involvement with methamphetamine was not relevant to Audra's credibility with regard to her ability to have perceived and recalled the acts she accused defendant of committing. (citation omitted).

However, the toxicology report did not close the door to the use of Bohanon's testimony to show that Audra had been a seller of methamphetamine and, thus, to imply that she had exhibited a readiness to lie. (citations omitted).

Nevertheless, defendant is not entitled to reversal of the judgment because it is not reasonably likely that defendant would have obtained a more favorable result had the evidence been admitted on the issue of Audra's credibility. Contrary to defendant's claim, this was far from a close case. As soon as Audra was able to escape from defendant, she immediately ran to Country Club Lanes and reported that she had been raped. She was upset and crying, her clothes were torn, and disheveled. Contrary to defendant's version of the incident, in which he claimed Audra was "tipsy" and "loaded," Deputy Sheriff Ivan Clark testified that Audra showed no signs of being intoxicated or under the influence of drugs, and a toxicology report confirmed this. Audra's demeanor and appearance were inconsistent with what would be expected from one who has just engaged in consensual sex. In addition, Audra told the examining nurse practitioner that defendant had threatened to "stab [her] in the neck" if she didn't "shut up." That defendant had made such a statement was confirmed by Gail Clark's

1    testimony that defendant arrived home shortly after the reported
     assault, appeared upset, nervous, and scared and said he had
2    "stabbed a Nigger in the neck" behind a dumpster, the location
     where Audra reported the attack took place.
3
     Because it is not reasonably likely that defendant would have
4    obtained a more favorable result had the jury heard testimony from
     Bohanon that he had seen Audra packaging methamphetamine for
5    sale in the past, defendant was not prejudiced by the exclusion of
     this evidence.
6

7    (Opinion at 5-10.)

8            Criminal defendants have a constitutional right, implicit in the Sixth Amendment,

9    to present a defense; this right is "a fundamental element of due process of law." Washington v.

10   Texas, 388 U.S. 14, 19 (1967). See also Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("Whether

11   rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory

12   Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal

13   defendants 'a meaningful opportunity to present a complete defense'") (quoting California v.

14   Trombetta, 467 U.S. 479, 485 (1984)). The right to present a defense includes, of course, the

15   right to present witnesses. Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("[f]ew rights are

16   more fundamental than that of an accused to present witnesses in his own defense"). However,

17   the right to present a defense is not unlimited. Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir.

18   2002). For instance, the Confrontation Clause only guarantees "an opportunity for effective

19   cross- examination, not cross-examination that is effective in whatever way, and to whatever

20   extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985). In addition, a

21   state law justification for exclusion of evidence does not abridge a criminal defendant's right to

22   present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty

23   interest of the accused." United States v. Scheffer, 523 U.S. 303, 308 (1998). See also Crane,

24   476 U.S. at 689-91 (discussion of the tension between the discretion of state courts to exclude

25   evidence at trial and the federal constitutional right to "present a complete defense"). The

26   exclusion of testimony regarding a victim's background violates a defendant's right to a fair trial

13

1  only if the omitted evidence, evaluated in the context of the entire record, creates a reasonable

2  doubt that did not otherwise exist.  See United States v. Agurs, 427 U.S. 97, 112 (1976).  A state

3  court's evidentiary ruling is grounds for federal habeas relief only if it renders the state

4  proceedings so fundamentally unfair as to violate due process.  Drayden v. White, 232 F.3d 704,

5  710 (9th Cir. 2000).  See also Whelchel v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000);

6  Montana v. Egelhoff, 518 U.S. 37, 53 (1996) (plurality opinion suggesting that any justification

7  by the state court for exclusion of evidence is sufficient to satisfy due process).

8         In the petition before this court, petitioner claims that his right to present a

9  complete defense was violated by the exclusion of Bohanon, Ackerman, Ellis and Wise as

10  witnesses for the defense.  He argues that it was imperative for him to be able to expose the

11  background of the victim, whose credibility was "virtually the only issue."  (Pet. at 19.)  He

12  contends that the exclusion of this evidence left him without any witnesses in his defense.  He

13  also notes the prosecutor's closing argument that "[the victim] was credible and that [petitioner]

14  was not."  (Id. at 17.)  In sum, petitioner contends that the exclusion of this evidence, in a case

15  where the credibility of the witnesses was crucial, rendered his trial fundamentally unfair.

16         As described above, the state appellate court denied this claim on the ground that

17  any error in excluding the testimony of these four witnesses was not prejudicial because of the

18  overwhelming evidence of petitioner's guilt.  This conclusion is not objectively unreasonable,

19  nor is it "arbitrary" or "disproportionate."  As explained by the state court, the evidence against

20  petitioner was substantial.  It included the observations of people who saw the victim after she

21  was assaulted, including hospital personnel, and petitioner's own actions after the event.  This

22  evidence, which had nothing to do with the victim's reputation or behavior, corroborated the

23  victim's testimony as to what occurred.  Further, the vague statements of the proposed witnesses

24  do not give rise to any inference that the victim lied at petitioner's trial.  Under the circumstances

25  of this case, evidence that the victim possessed and sold methamphetamine, while it might have

26  /////

1  had some bearing on her overall credibility, was insufficient to create reasonable doubt as to

2  petitioner's guilt and did not render petitioner's trial fundamentally unfair.[5]

3          In the traverse, petitioner adds allegations that are not contained in the petition,

4  were not presented to the state courts, and have not been addressed by respondent.  He states that

5  a critical part of his defense was that the victim "framed" him at the request of members of a

6  motorcycle gang ("the Misfits") who were upset that petitioner had refused to join them.

7  (Traverse at 13-14.)  He argues the excluded witnesses would have testified, in support of this

8  defense, that the victim was a "biker girl" and that she sold drugs at a bar frequented by members

9  of the Misfits motorcycle gang.  Petitioner also argues that the exclusion of these four witnesses

10 allowed the prosecutor to argue during closing argument, falsely, that there was no evidence

11 linking the victim to "the Misfits."  (Id. at 5-6; see Reporter's Transcript on Appeal (RT) at 316.)

12 In another allegation raised for the first time in the traverse, petitioner claims that the court

13 improperly excluded the testimony of Alan Gilmore, "an expert witness whose testimony was

14 material to petitioner's defense he was framed because his testimony would have shown the jury

15 that the tears in his accuser's clothing were made in a clear environment after the alleged rape

16 rather than during a rape on the ground where they allegedly lay after torn."  (Traverse at 14.)

17 Finally, petitioner argues that the trial court's decision to exclude these witnesses forced him to

18 testify, thereby subjecting him to impeachment with his prior convictions.

19          To the extent petitioner is attempting to belatedly raise new claims in this manner,

20 they are conclusory and improperly raised and should be denied on that basis.  See Jones v.

21 Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)

22 ("It is well-settled that '[c]onclusory allegations which are not supported by a statement of

23

24          [5]  Petitioner also cites Rock v. Arkansas in support of this claim.  In that case, the United
   States Supreme Court held that a state evidentiary rule prohibiting the admission of hypnotically
25 refreshed testimony violated the petitioner's constitutional right to testify in her own defense.
   483 U.S. 44.  In this case, petitioner freely testified at his trial to his version of the events.
26 Accordingly, Rock would not appear to provide support for petitioner's claim.

1  specific facts do not warrant habeas relief'")); <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th

2  Cir. 1994) (a traverse is not the proper pleading to raise additional grounds for relief);

3  <u>Greenwood v. Fed. Aviation Admin.</u>, 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues

4  which are argued specifically and distinctly in a party's opening brief").  Even if these claims had

5  been properly raised, petitioner has failed to demonstrate a constitutional violation.  The witness

6  statements contained in the record before this court do not establish that the Misfits recruited the

7  victim to frame petitioner for rape.  At most, the evidence suggests that the victim had a

8  reputation as a "biker girl" and may have been seen at a bar frequented by members of the

9  Misfits.  This falls far short of relevant evidence supporting petitioner's specific defense that a

10  particular group of people induced the victim to engage him in consensual sex during a chance

11  encounter and then claim that she was raped.  Similarly, petitioner's challenge to the prosecutor's

12  comments during closing argument to the effect that petitioner had no evidence to support his

13  version of the events must fail.  As correctly stated by the prosecutor, none of the evidence

14  suggested by petitioner shows a specific link between the victim and the Misfits motorcycle

15  gang.  The testimony of these witnesses was simply insufficient to support petitioner's

16  allegations in this regard and its exclusion did not render petitioner's trial fundamentally unfair.

17      Petitioner's other claims raised in the traverse also lack merit.  The exhibit

18  describing the findings of excluded witness Alan Gilmore is insufficient to establish that the

19  victim tore her own clothing after the sexual encounter, as petitioner alleges.  (Traverse at 9 &

20  Ex. 2.)  Petitioner's vague and unsupported claim that he was "forced" to testify in his own

21  defense simply because these witnesses were excluded is insufficient to support a due process

22  claim.  For all of these reasons, petitioner's arguments contained in the traverse should be

23  rejected and his due process claim should be denied.

24      D.  <u>Right to Discovery</u>

25      In his next claim, petitioner argues that the trial court erred in refusing to allow

26  him access to documents from the files of the victim's children in the possession of the

1   Sacramento County Department of Health and Human Services and Department of Child

2   Protective Services.  He argues that the records were necessary to show that the victim "was a

3   drug addict, suffered from hallucinations, sold drugs, and traded sex for money" and also to

4   provide the identity of the father of the victim's children, whom petitioner wished to interview as

5   a possible witness to impeach the victim's credibility.   (Pet. at 27.)

6           The California Court of Appeal explained this claim and its resolution as follows:

7           In another effort to obtain evidence to impeach Audra's credibility,
            defendant subpoenaed confidential documents from the
8           Sacramento County Department of Health and Human Services
            relating to Audra and her children.  The County Counsel opposed
9           the disclosure but provided the records to the trial court.

10          Without specifying any basis for his view, defendant's counsel told
            the court he "believe[d]" the records would show Audra was a drug
11          addict, was an unfit mother, suffered from hallucinations, took
            homeless people off the street, sold drugs from the back window of
12          her apartment, and traded sex for drugs.  Additionally, he asserted,
            the reports would provide him with the identity of the children's
13          father, whom counsel wanted to interview regarding to [sic] the
            foregoing factors.

14
            Although expressing its doubt that defendant was entitled to "any
15          of this," the trial court conducted an in camera hearing and
            concluded there was nothing in the records that would aid
16          defendant.

17          Defendant asks us to review the records to determine whether they
            contain information that Audra suffered from drug addiction and
18          hallucinations, sold drugs, or traded sex for money.  We decline to
            make such review because defendant's offer of proof does not
19          justify it.

20          The reports are confidential (Welf. & Inst. Code, §§ 827, 10850;
            42 U.S.C. §§ 671, subd. (a)(8), 11167.5), and the County Counsel
21          claimed the privilege not to disclose them (Evid. Code, § 1040,
            subd. (b)).  Of course, the privilege must give way "where it
22          conflicts with a defendant's constitutional rights of confrontation
            and cross-examination[.]" (Foster v. Superior Court (1980) 107
23          Cal.App.3d 218, 229.)  However, disclosure of confidential
            information is not required without a showing of "plausible
24          justification" for its release.  (Id. at pp. 229-230.)

25          Defense counsel's mere speculation as to the contents of the
            records did not qualify as a "plausible justification" for either an in

26   /////

17

1   camera inspection of the records by the trial court or a review of
    those records by this court.

2

3   (Opinion at 10-11.)

4          Petitioner contends that the trial court's failure to release the above-described

5   information was contrary to clearly established federal law as set forth in People v. Ritchie, 480

6   U.S. 39, 58 (1987).  In Ritchie, the defendant, who had been convicted of child molestation,

7   sought to have records of a state protective services agency responsible for investigating cases of

8   child mistreatment disclosed during pretrial discovery.  Pursuant to a Pennsylvania statute, the

9   records were subject to qualified confidentiality.  Id. at 57-58.  Applying the rule of Brady v.

10  Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that, when state law provides for

11  qualified confidentiality, a criminal defendant has the right, under the due process clause of the

12  fourteenth amendment, to have the records reviewed in camera by the judicial authority to

13  determine whether they contain potentially exculpatory information.  Id. at 57-58.[6]  Although

14  both a Brady due process claim and a confrontation clause claim were at issue in Ritchie, a

15  plurality of the court concluded that the confrontation clause is not applicable to a claim

16  involving the denial of access to pretrial materials.  Id. at 51-54 (plurality opinion).  Accordingly,

17  the case was decided on due process grounds.

18  /////

19

20         [6] Due process is denied when the government fails to make available to a criminal
    defendant evidence favorable to the defendant and material either to guilt or innocence.  Brady,
21  373 U.S. at 87.  "[E]vidence is material only if there is a reasonable probability that, had the
    evidence been disclosed to the defense, the result of the proceeding would have been different.  A
22  'reasonable probability' is a probability sufficient to undermine confidence in the outcome."
    Ritchie, 480 U.S. at 57 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).  Petitioner is
23  not raising a Brady claim, nor could he.  There is no evidence the prosecutor or any entity acting
    on its behalf failed to make exculpatory information available after a request from the defense.
24  Further, there is no indication that the result of petitioner's trial would have been different had
    information from the files of petitioner's children been disclosed to the defense.  In any event,
25  any possible due process concerns in this case were addressed by the in camera review conducted
    by the state trial court.  See Ritchie, 480 U.S. at 60.

26

1    The decision of the California Court of Appeal denying petitioner's claim in this

2 regard is not contrary to or an unreasonable application of Ritchie and should not be set aside.

3 Petitioner claims that the confrontation clause conferred a right to pre-trial discovery of

4 information necessary to conduct more effective cross-examination of the victim.  However, as

5 discussed above, the United States Supreme Court has not clearly decided that the Sixth

6 Amendment confers a right to discover privileged information from a state agency before trial.

7 In addition, the Confrontation Clause only guarantees an opportunity for effective

8 cross-examination, not access to every possible source of information relevant to

9 cross-examination.  Ritchie, 480 U.S. at 53-54.  The state trial court found, after its in camera

10 review, that petitioner was not entitled to the requested records.  The court apparently concluded

11 that the relevance of the records to petitioner's trial did not outweigh privacy concerns.  "Trial

12 judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable

13 limits on . . . cross-examination based on concerns about, among other things, harassment,

14 prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only

15 marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  Finally, even

16 assuming arguendo that the records would have tended to show the victim was a drug addict

17 and/or a drug dealer, petitioner has failed to show that the evidence would have changed the

18 outcome of his trial.  Accordingly, for all of these reasons, this claim should be denied.

19    E.  Right to Self-Representation

20    In his final claim, petitioner contends that the trial judge violated his rights

21 pursuant to Faretta v. California, 422 U.S. 806, 807 (1975), when he granted petitioner's motion

22 to represent himself after the jury returned its verdict.  He argues that he was "manifestly

23 incapable of representing himself in this proceeding" and that the trial on his prior convictions

24 and the sentencing proceedings were "reduced to a sham without defense counsel."  (Pet. at 29.)

25    The California Court of Appeal fairly described the background to this claim as

26 follows:

Immediately following the return of the jury's verdicts, and before the court trial on the prior conviction allegations, defendant proclaimed that his "attorney got him guilty for nothing" and moved to represent himself pursuant to <u>Faretta v. California</u> (1975) 422 U.S. 806 [45 L.Ed. 2d 562].

The court advised defendant of his right to counsel and told him that self-representation was not wise, the punishment could be great, he would receive no special treatment, he would be opposed by a trained attorney, he would have to comply with all of the rules of criminal procedure and evidence, and he could not assert ineffective assistance of counsel on appeal if he represented himself. When the court asked him about his legal background, defendant responded: "Just from being in here a year and a half." Defendant acknowledged that he understood the court's advisements and still wanted to represent himself. The court then granted the motion, and defendant proceeded to represent himself on the trial of the prior convictions and at sentencing.

(Opinion at 17.)

Petitioner argued in the state appellate court that the trial court abused its discretion in granting petitioner's <u>Faretta</u> motion because (1) he did a poor job at both the trial on his prior convictions and at sentencing, reducing them to "sham proceedings," and (2) the court failed to inquire as to why defendant was dissatisfied with his appointed counsel. (<u>Id.</u> at 18.) The court rejected these claims with the following reasoning:

That a defendant will perform poorly while representing himself cannot be known to the court at the time of considering a motion for self-representation and is therefore not a proper factor for consideration. (<u>People v. Clark</u> (1965) 62 Cal.2d 870, 883 (An appellate court will look only at the facts existing at the time the motion is made.) And defendant's technical knowledge is an irrelevant consideration to such a motion. (<u>People v. Windham</u>, <u>supra</u>, 19 Cal.3d at p. 128.)

As to querying defendant regarding his dissatisfaction with counsel, no specific inquiry was required in this case inasmuch as the record establishes the court was well aware of defendant's dissatisfaction and the reasons therefore. At the time defendant moved for self-representation, he announced he was doing so because his "attorney got him guilty for nothing." Moreover, the trial judge had heard defendant's earlier complaints against his counsel when the court denied defendant's <u>Marsden</u> motion. (<u>People v. Marsden</u> (1970) 2 Cal.3d 118.)

20

1      In addition, trial counsel was defendant's third attorney, thereby
       demonstrating that defendant had a proclivity for being dissatisfied
2      with appointed counsel.  Nothing in the record indicated that
       counsel's performance was not adequate.  Counsel simply had a
3      difficult client against whom there was overwhelming evidence of
       guilt.  The most complex state of the trial, the guilt phase, was
4      over.  Consequently, the court's inquiry created a record adequate
       for review.

5

6   (Id. at 18-19.)

7          The Sixth Amendment provides that "the accused shall enjoy the right ... to have

8   the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  In felony cases, a criminal

9   defendant is entitled to be represented by counsel at all critical stages of the prosecution,

10  including sentencing.  See Mempa v. Rhay, 389 U.S. 128, 134-37 (1967).  In Faretta v.

11  California, 422 U.S. 832 (1975), the United States Supreme Court held that a criminal defendant

12  has a constitutional right to proceed pro se.  In making its ruling, the court stated as follows:

13              Here, weeks before trial, Faretta clearly and
                unequivocally declared to the trial judge that he
14              wanted to represent himself and did not want
                counsel. The record affirmatively shows that Faretta
15              was literate, competent, and understanding, and that
                he was voluntarily exercising his informed free will.
16              The trial judge had warned Faretta that he thought it
                was a mistake not to accept the assistance of
17              counsel, and that Faretta would be required to
                follow all the 'ground rules' of trial procedure. We
18              need make no assessment of how well or poorly
                Faretta had mastered the intricacies of the hearsay
19              rule and the California code provisions that govern
                challenges of potential jurors on voir dire. For his
20              technical legal knowledge, as such, was not relevant
                to an assessment of his knowing exercise of the
21              right to defend himself.

22  Id., at 835.  Faretta articulates what the Sixth Amendment requires for a valid waiver of the right

23  to counsel and is clearly established federal law for purposes of collateral review of state court

24  proceedings.  Pursuant to Faretta, a criminal defendant has a Sixth Amendment right to conduct

25  his own defense, provided only that he knowingly and intelligently forgoes his right to counsel

26  and that he is able and willing to abide by rules of procedure and courtroom protocol  Id. at 821.

21

1  The holding of Faretta is based on "the long-standing recognition of a right of self-representation

2  in federal and most state courts, and on the language, structure, and spirit of the Sixth

3  Amendment." McKaskle v. Wiggins, 465 U.S. 168, 174 (1984).

4          Petitioner has failed to demonstrate that the California courts' rejection of this

5  claim was contrary to or an unreasonable application of clearly established federal law.

6  Petitioner clearly indicated that he wished to represent himself, he was warned about the dangers

7  of self-representation, and he chose to proceed pro se.[7]  He does not argue that his waiver of the

8  right to counsel was not voluntary and/or knowing and there is no indication in the record that

9  petitioner was incompetent to waive his constitutional rights.  Because a competent defendant is

10  entitled to make his or her own decision with respect to representation, it is irrelevant whether

11  the defendant is capable of representing himself or herself effectively.  Godinez v. Moran, 509

12  U.S. 389, 400 (1993).  Accordingly, this claim should be denied.

13          For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

14  petitioner's application for a writ of habeas corpus be denied.

15          These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

17  days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within ten days after service of the objections.  The parties are advised

21  /////

22  /////

23  /////

24  ───────────────

25  [7]  The exact warnings given to petitioner by the state trial judge are not at issue because "[n]either the Constitution nor Faretta compels the district court to engage in a specific colloquy with the defendant." Lopez v. Thompson, 202 F.3d 1110, 1117 (9th Cir. 2000).

26

1 that failure to file objections within the specified time may waive the right to appeal the District

2 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3 DATED:   April 22, 2005.

4

5

6

UNITED STATES MAGISTRATE JUDGE

7 JFM:8:revak1685.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26